No.  96-302

IN THE SUPREME COURT OF THE STATE OF MONTANA

1997


STATE OF MONTANA,

Plaintiff and
Respondent,

vs.

NORMAN ALVIN ADAMS

Defendant and Appellant.


APPEAL FROM:          District Court of the Nineteenth Judicial District,
                               In and for the County of Lincoln,
                     The Honorable Michael C. Prezeau, Judge presiding.


COUNSEL OF RECORD:

For Appellant:

Amy N. Guth, Lincoln County Public Defender, Libby, Montana

For Respondent:

Joseph P. Mazurek, Attorney General, Elizabeth L. Griffing,
Assistant
Attorney General; Bernie Cassidy, Lincoln County Attorney, Libby, Montana



Submitted on Briefs: December 19, 1996

Decided:  July 15, 1997
Filed:

_____
Clerk

Justice James C. Nelson delivered the Opinion of the Court.


This is an appeal from the Nineteenth Judicial District Court, Lincoln County.  On February 22, 1996, the District Court entered its findings of fact, conclusions of law and order denying Defendant Adams' motion to suppress evidence seized pursuant to a search warrant.  From this judgment, Defendant Adams appeals.  We affirm.

The sole issue raised on appeal is whether the State conducted a search of Defendant Adams' home which violated Defendant Adams' constitutional guarantees of privacy and freedom from unreasonable search and seizure.

FACTUAL AND PROCEDURAL BACKGROUND

This case arose from a search of the rented residence of Defendant Adams (Adams) located in Libby, Montana.  The search was conducted pursuant to a search warrant issued based upon information supplied by Michael Dotts (Dotts), a man arrested on September 23, 1995, in Lincoln County for assault and disorderly conduct.  Upon his arrest, Dotts gave the police a false name.  After his arrest, Dotts advised the police that he had information concerning a marijuana growing operation in Libby.

On September 25, 1995, during his first interview with the police, Dotts told Detective Hurtig and Detective Martin he would like to make a deal with them.  Although Dotts did not want the charges against him dropped, he wanted to be released on his own recognizance in exchange for his information regarding the marijuana growing operation.  The detectives advised Dotts that they could not guarantee him anything.  Rather, they told Dotts he should tell them everything he knew and explained that if his information was used, they might be able to help him; but, if the information was not used, he would remain in jail.

Dotts explained, in this first interview, that he had previously lived with Adams' son, Gary, but that the marijuana growing operation was in Adams' house in Libby.  Because Dotts could not remember the address of Adams' house, he left the station with the detectives and pointed out a gray house with an off-yellow roof, located on the corner of Quartz Road and Rawlings Road.  After returning to the station to complete this first interview, Dotts told the detectives that he had helped to set up the grow operation in Adams' house.  He described the grow operation as a hydroponic system, where the

plants are grown in water, with a 1000-watt converter bulb and a 400-watt, two burner bulb used as grow lights.

After this first interview, Detective Hurtig again went to Adams' residence, without Dotts. He took pictures of Adams' house and two vehicles parked in front of the house--a brown Mustang and a white Lincoln--vehicles which were not present when Dotts first identified the house. Upon his return to the station, Detective Hurtig learned that the State of Washington had a warrant for Dotts' arrest. Consequently, only two hours after the first interview, Detective Hurtig conducted a second interview with Dotts.

He explained to Dotts that due to the outstanding warrant, he could not release Dotts on his own recognizance. Despite this, Dotts agreed to interview with Detective Hurtig for a second time to describe the marijuana growing operation in Libby.

In the second interview, Dotts again described the hydroponic marijuana growing operation he helped set up and the type of plants that Adams was growing. Dotts explained that only three weeks earlier he had been in Adams' house which Dotts believed Adams rented under a false name. Additionally, Dotts' description of the vehicles driven by Adams and his son, Gary, matched the description of the vehicles that Detective Hurtig had previously photographed at Adams' house. Furthermore, Dotts stated that, prior to his arrest that day, he had talked with Gary Adams who informed him that "they were moving the plants" and getting ready to go to Sandpoint, Idaho. Shortly after this second interview, Detective Hurtig corroborated Dotts' statement by locating in the Clerk and Recorderþs office the name of the owner of the house Adams rented, calling the owner and confirming that Adams was renting the house under his true name.

Based upon Dotts' information, Detective Hurtig prepared a search warrant application that same day (September 25, 1995) using a generic search warrant form that he obtained from the Montana Department of Justice which specifically listed the types of materials commonly used and found in conjunction with a marijuana growing operation. In this application, Detective Hurtig did not use Dotts as a confidential informant, but rather specifically identified him. Detective Hurtig explained that Dotts had provided him with information about a growing operation involving over 100 marijuana plants while Dotts was held in the Lincoln County Jail due to his arrest in Lincoln County for assault and because the State of Washington had issued a warrant for his arrest. Detective Hurtig also explained Dotts' role in helping to set up the marijuana growing operation in Adams' house. Furthermore, Detective Hurtig described his personal observations of Dotts and explained how he had corroborated Dotts' information.

Without consulting the Lincoln County Attorney's Office, Detective Hurtig

presented the search warrant application on September 25, 1995, to the acting district court judge who reviewed the application and signed the search warrant authorizing a search of Adams' residence. That same afternoon, Detective Hurtig served and executed the search warrant on Adams' house. The search yielded a sophisticated hydroponic marijuana growing operation and approximately 133 marijuana plants in different stages of growth. Apparently, either a search of the vehicles on the property was not conducted or if a search was conducted, no incriminating evidence was found. Thereafter, Detective Hurtig arrested Adams on the charge of Criminal Production or Manufacture of Dangerous Drugs.

On October 5, 1995, Adams was charged with Criminal Production or Manufacture of Dangerous Drugs pursuant to 45-9-110, MCA. Adams filed a motion to suppress evidence seized pursuant to a search warrant and the District Court heard this motion on February 5, 1996. On February 22, 1996, the District Court entered its findings of fact, conclusions of law and order denying Adams' motion to suppress. Subsequently, Adams entered into a plea agreement. Pursuant to the plea agreement, Adams plead guilty to Criminal Possession of Dangerous Drugs pursuant to 45-9-102, MCA, and the State agreed to dismiss the charge of Criminal Production or Manufacture of Dangerous Drugs. Adams reserved the right to appeal the District Court's denial of his suppression motion. On April 17, 1996, Adams entered a guilty plea, acknowledging that he had possessed marijuana in his home on September 25, 1995, in violation of the law. On May 23, 1996, Adams was given a three-year deferred sentence with a $500.00 fine. Adams now appeals the District Court's February 22, 1996 Order denying his motion to suppress.

## DISCUSSION

Did the State conduct a search of Adams' home which violated Adams' constitutional guarantees of privacy and freedom from unreasonable search and seizure?

On January 17, 1996, Adams filed a motion to suppress evidence seized by the Lincoln County Sheriff's Department during the search conducted on September 25, 1995, and requested that the District Court conduct a hearing pursuant to Franks v. Delaware (1978), 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (procedure for challenging the truthfulness of factual statements made in an application for search warrant). In his brief supporting his suppression motion, Adams alleged that the State conducted an unreasonable search because the search warrant lacked probable cause. Pursuant to Adams' request in his suppression motion, the District Court conducted a hearing on February 5, 1996, and heard the testimony of Detectives Hurtig and Martin as well as Adams.

Subsequently, the District Court entered its findings of fact, conclusions of law and order denying Adams' motion to suppress. In Conclusion of Law No. 3, the District Court stated:

On the facts before the Court, it cannot be said that Dotts' statements should have been rejected as coming from a source unworthy of belief.

The Court concludes that the Lincoln County Sheriff's Office had probable cause to believe that drugs were present in a house they knew to be occupied by Adams.

Dotts' admissions to: (1) selling the grow equipment to Adams; (2) assisting Adams in setting up the operation; and (3) manicuring the marijuana plants for Adams, are all corroborative of Dotts' statements regarding the presence of a marijuana grow operation in Adams' residence. Furthermore, regarding corroboration, the Application states:

"Mr. Dotts said that Norman Adams drove a white Lincoln with Alaska license plates, and that Gary Adams drove a Ford Mustang GT that was brown in color that had Montana license on it. This matches the two vehicles that were parked in front of the residence of 45 Quartz Road although I could not see the license plates of the vehicles. I then checked with the Land Classification Office in the Lincoln County Courthouse to find out who owned the property and found that it was owned by Greg and Susan Rice of Libby. I contacted Susan Rice and she told me that Norman Adams was currently renting the property from them. Mr. Dotts appears to be telling the truth and I was able to confirm a large portion of the information that he has given me. Mr. Dotts asked for nothing in giving me this information and I have offered him nothing in return for this information."

The fact that Dotts happened to know the types of cars driven by the Adams and the fact that Adams was renting the residence from a doctor contribute little of substance to his credibility. Nonetheless, these minor facts, coupled with Dotts' admissions against interest, do provide some corroboration which further bolsters his testimony.

Granted, the information in the Application is arguably incomplete or inaccurate. For instance, it is not mentioned in the Application that, contrary to Dotts' statement to the detectives, Adams was not renting the house under an alias. Nor is it mentioned in the Application that the only alias involved in this case was the one Dotts himself used when he was arrested.

Nor is it entirely true that "Dotts asked for nothing in giving me this information . . ." In fact, when he first offered the information, Dotts made it clear he was seeking a release from custody on his own recognizance. Before the search warrant was actually issued, Detective Hurtig testified that he had received information from the State of Washington that Dotts was to be held in custody without bail, and he had conveyed this information to Dotts, but when Dotts provided the information which formed the basis of the Application, he was operating under the hope and belief that the detectives could assist him in being released from custody.

These inconsistencies are troubling but not fatal. The fact remains that Dotts provided detailed and fresh information about criminal activity,

and his status as a co-conspirator in that criminal activity, coupled with his knowledge of certain collateral facts, establish his trustworthiness for purposes of the Application. The Court concludes probable cause was established for the search of Adams' residence.

On appeal, Adams raises three arguments to support his contention that the District Court erred by denying his suppression motion. First, pursuant to Article II, Section 10 of the Montana Constitution, Adams argues that we should adopt a policy of "zero tolerance" when intentional misstatements or omissions of police officers are made in search warrant applications. Second, pursuant to Article II, Section 11 of the Montana Constitution, Adams argues that the search warrant was not supported by sufficient probable cause due to Detective Hurtig's alleged intentional misstatements and omissions in his search warrant application. Finally, Adams argues that the search warrant was unconstitutionally overbroad because it did not state with sufficient particularity the items to be seized in Adams' residence.

Adams first argues that, based on Article II, Section 10 of the Montana Constitution, Montana's privacy clause, this Court should abandon the procedure set forth in Franks which allows a court to reevaluate the sufficiency of probable cause supporting a search warrant after excising any misstatements which a defendant has proven by a preponderance of the evidence to be intentional. In its place, Adams argues that we should adopt a policy of "zero tolerance" which would allow a court to quash an entire search warrant if the warrant's application contained intentional misstatements or omissions. The State responds that we should not address this issue because Adams raises it for the first time on appeal.

Upon review of Adams' brief in support of his motion to suppress and the transcript of the District Court hearing held February 5, 1996, we conclude that Adams did not raise this theory of "zero tolerance" to support his objection to the search warrant application. Therefore, because this argument is raised for the first time on appeal, we will not address it. Rasmussen v. Lee (1996), 276 Mont. 84, 88, 916 P.2d 98, 100. Consequently, the procedure set forth in Franks is controlling in this case.

While Adams' next argument is not clearly articulated on appeal, he appears to alternatively rely on Article II, Section 11 of the Montana Constitution and Franks to assert that this Court should review the District Court's conclusions regarding Detective Hurtig's alleged misstatements and omissions as well as the court's overall decision that the search warrant was supported by sufficient probable cause. Unlike Adams' first argument concerning our adoption of a policy of "zero tolerance," we note that Adams, in his suppression motion, requested that the District Court hold a Franks hearing to address Detective Hurtig's alleged misstatements and omissions. Furthermore, after the

hearing held February 5, 1996, the District Court directly addressed these issues in its February 22, 1996 Order, as evidenced in Conclusion of Law No. 3, set forth above. Consequently, because Adams raised this argument before the District Court, we will address the merits of Adams' second argument now on appeal.

Relying on State v. Valley (1992), 252 Mont. 489, 830 P.2d 1255; and State v. Kaluza (1995), 272 Mont. 404, 901 P.2d 107, Adams argues that the District Court erred when it denied his motion to suppress based on its determination that sufficient probable cause supported the search warrant. Adams asserts that probable cause did not exist because Detective Hurtig failed to fully corroborate all of the information provided by Dotts and because his statement in the search warrant application describing Dotts as a reliable informant was not based on any objective facts. Adams contends that Detective Hurtig's assertion of Dotts' reliability is baseless for a number of reasons. First, Adams notes that Detective Hurtig omitted from the search warrant application the fact that Dotts had given a false name upon his arrest. Second, Adams claims that Detective Hurtig misstated that Dotts did not expect to be released from jail in return for his information. Finally, Adams asserts that Detective Hurtig's statements concerning Dotts' reliability are directly contradicted by Detective Martin's statements, made during Dotts' first interview, that the detectives did not know him.

The State responds that Adams' reliance on Valley and Kaluza to assert that Dotts was an "unreliable" informant is misplaced because, unlike in those cases, Dotts was not a confidential informant. Rather, the State argues that Dotts' veracity and reliability were established when he made statements implicating himself in the marijuana growing operation. That is, the State contends that because Dotts' information concerning the marijuana growing operation allegedly located in Adams' house implicated Dotts' own penal interests, his statements were inherently reliable, and, therefore, did not require corroboration. Furthermore, the State maintains that the omissions and misstatements that Adams argues Detective Hurtig made in the application for search warrant are immaterial to the determination of Dotts' credibility. Finally, the State asserts that Dotts' basis of knowledge was established because he provided fresh, detailed information based upon his personal observation of the growing operation. Accordingly, the State argues that the District Court properly concluded that the search warrant was supported by probable cause, and, thereby properly denied Adams' motion to suppress. We agree.

"We review the District Court's conclusions of law in ruling on a motion to suppress evidence to determine whether the trial court's interpretation and application of the law is correct." State v. Pastos (1994), 269 Mont. 43, 45, 887 P.2d 199, 201. Generally, probable cause must be determined from the four corners of the search warrant application. State v. Rinehart (1993), 262 Mont. 204, 211, 864 P.2d 1219, 1223. However, the United States Supreme Court set forth an exception to this rule in Franks, which allowed a defendant to challenge the truthfulness of statements made in an application for search warrant. We adopted the Franks procedure in State v. Sykes (1983), 194 Mont. 14, 20, 663 P.2d 691, 695, and we have since consistently applied this rationale. See e.g., State v. Feland (1994), 267 Mont. 112, 882 P.2d 500; State v. Mosley (1993), 260 Mont. 109, 860 P.2d 69; State v. Garberding (1990), 245 Mont. 356, 801 P.2d 583; State v. Hembd (1989), 235 Mont. 361, 767 P.2d 864 (overruled on other grounds); State v. Wilson (1985), 218 Mont. 359, 708 P.2d 270.

In Mosley, we described the Franks procedure as follows:

The defendant must first make a substantial preliminary showing that a false statement was knowingly or intentionally made, or was made with reckless disregard for the truth. If defendant makes such a showing, and the misstatement was necessary to a finding of probable cause, a hearing must be held at defendant's request. When a hearing is held, the allegation of perjury or reckless disregard must be proved by defendant by a preponderance of the evidence. Once proved, the offending information must be excised from the warrant application. If after the egregious material is excised, the remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded.

Mosley, 860 P.2d at 73 (citing Franks, 438 U.S. at 155-56).

Accordingly, before we address Adams' argument that the search warrant lacked probable cause, we must first consider the effect of Detective Hurtig's alleged misstatements and omissions on Dotts' credibility. Adams first notes that Detective Hurtig omitted from the search warrant application the fact that Dotts had given a false name upon his arrest. Second, Adams claims that Detective Hurtig misstated that Dotts did not expect to be released from jail in return for his information. We agree with the State that this information is immaterial to the determination of Dotts' credibility.

In Garberding, a defendant similarly argued that the district court erred by denying him an evidentiary hearing pursuant to Franks based on the alleged facts that the sheriff had failed to indicate in the search warrant application that the primary informant was a convicted felon and had received a cash reward for his information. Garberding, 801 P.2d at 586. We disagreed with the defendant, concluding that these alleged misstatements and omissions did not justify a Franks hearing. Garberding, 801 P.2d at 586. Rather, we concluded that this information added credit to the informant's tip

because "[a] person of known criminal activity or a person admitting his own criminal activity is not likely to place himself in such a dubious position unless he is telling the truth." Garberding, 801 P.2d at 586.

Here, the District Court concluded in Conclusion of Law No. 3, that upon review of the misstatements and omissions regarding Dotts' use of a false name upon his arrest, his expectation of release in exchange for his information about the marijuana growing operation, as well as Dotts' admissions concerning his participation in the growing operation, "it cannot be said that Dotts' statements should have been rejected as coming from a source unworthy of belief." We agree. Just as in Garberding, Dotts admitted to his own criminal activity, and, therefore, the information about Dotts' use of a false name and his expectation of release "does not cast doubt on the reliability of his information." See Garberding, 801 P.2d at 586. Consequently, we find unpersuasive Adams' arguments that based on Detective Hurtig's misstatements and omissions the District Court erred when it denied his motion to suppress.

Additionally, we find unpersuasive Adams' argument that Detective Hurtig's statements in the search warrant application concerning Dotts' reliability are directly contradicted by Detective Martin's statements, made during Dotts' first interview, that the detectives did not know him. In response to Dotts' question, Detective Martin explained in this first interview that he could not use Dotts as a confidential informant because this was the first time he had met Dotts:

If I put down in a search warrant I have a confidential reliable informant, it has to be something or somebody I know, somebody that I've dealt with in the past, somebody that I know has been truthful with me in the past and has never lied to me and so the information they're giving me is going to be truthful now. . . .. With you, I don't have that boat to go rowing in.

Contrary to Adams' argument, Detective Martin's comments do not contradict Detective Hurtig's statements concerning Dotts' reliability. Rather, we consider these comments merely an explanation why Dotts would not be used as a confidential informant.

Having concluded that the misstatements and omissions concerning Dotts' use of a false name and expectation of release are immaterial to his credibility, we next consider whether the District Court correctly concluded that probable cause supported the search warrant. When reviewing the issuance of a search warrant, our duty is to ensure that the magistrate or lower court had a substantial basis for concluding that probable cause existed; our duty is not to review the lower court's determination de novo. Rinehart, 864 P.2d at 1223.

A magistrate's determination that probable cause exists should be paid great deference by reviewing courts and every reasonable inference possible should be drawn to support that determination.  If a magistrate issues a search warrant after subjecting the application to the totality of the circumstances test, a reviewing court must presume that decision to be correct.

Rinehart, 864 P.2d at 1223 (citations omitted).

The Fourth Amendment to the United States Constitution and Article II, Section 11 of the Montana Constitution protect a person's right to be free from unlawful searches and seizures by requiring that probable cause exist before a search warrant is issued. Rinehart, 864 P.2d at 1222.   Yet, prior to issuing a search warrant, a magistrate must determine only that there is a probability, not a prima facie showing, of criminal activity. Rinehart, 864 P.2d at 1222.   We previously adopted the "totality of the circumstances" test, as set forth in Illinois v. Gates (1983), 462 U.S. 213, 103 S.Ct. 2317, 76 L. Ed.2d 527, to determine whether probable cause existed for issuance of a search warrant. State v. O'Neill (1984), 208 Mont. 386, 679 P.2d 760.   In determining probable cause under the totality of the circumstances test, the veracity, reliability and basis of knowledge of an informant remain highly relevant factors.  Rinehart, 864 P.2d at 1222.

As the State correctly contends, Adams' reliance on Valley and Kaluza to argue that Dotts' information lacked veracity and reliability is misplaced because both cases involved confidential informants or anonymous tips.  See Valley, 830 P.2d 1255; Kaluza, 901 P.2d 107.   In contrast to the informants in those cases, Dotts was not a confidential informant, and, therefore, Detective Hurtig did not need to verify Dotts' reliability by referencing his past conduct.   Rather, Dotts' veracity and reliability were established through Dotts' statements implicating himself in the marijuana growing operation.   See State v. Sundberg (1988), 235 Mont. 115, 121, 765 P.2d 736, 740.  See also Garberding, 801 P.2d at 586.

In fact, even if Dotts had been a confidential informant, the information he provided would have established sufficient probable cause because he admitted to helping set up the marijuana growing operation in Adams' house.  See Sundberg, 765 P.2d at 740 (admissions against interest are sufficient to establish probable cause).  In Sundberg, a confidential informant admitted to marijuana use and stated that he had been to the

defendant's home within the previous ten days and had seen marijuana growing there. We concluded that the affidavit containing this information was sufficient to establish probable cause for a search warrant. In support of our conclusion, we quoted the United States Supreme Court:

Common sense in the important daily affairs of life would induce a prudent and disinterested observer to credit these statements. People do not lightly admit a crime and place critical evidence in the hands of the police in the form of their own admissions. Admissions of crime, like admissions against proprietary interests, carry their own indicia of credibility-- sufficient at least to support a finding of probable cause to search. That the informant may be paid or promised a "break" does not eliminate the residual risk and opp[r]obrium of having committed criminal conduct . . ..

Sundberg, 765 P.2d at 740 (quoting United States v. Harris (1971), 403 U.S. 573, 583-84, 91 S.Ct. 2075, 2082, 29 L.Ed.2d 723, 734) (emphasis added).

Here, Dotts' credibility also is sufficient to support a finding of probable cause to search. First, Dotts was not used as a confidential informant. Second, as the District Court noted, Dotts admitted selling marijuana growing equipment to Adams; assisting Adams in setting up the operation; and manicuring marijuana plants for Adams. Based on this information, the District Court correctly concluded that "[Dotts'] status as a co-conspirator in that criminal activity, coupled with his knowledge of certain collateral facts, establish his trustworthiness for purposes of the Application [for Search Warrant]."

Despite Adams' arguments to the contrary, Detective Hurtig did not need to include additional information in the search warrant application concerning Dotts' past conduct to establish Dotts' reliability or veracity.

Nonetheless, Adams also contends that Detective Hurtig failed to fully corroborate Dotts' information. Specifically, Adams asserts that Detective Hurtig needed to more fully corroborate Dotts' information than just verifying that Dotts could properly identify Adams' house and the vehicles that Adams and his son drove as well as verifying that Adams rented the identified house. Yet, corroboration of an informant's information through other sources is only necessary when the information is hearsay or the informant is anonymous. Rinehart, 864 P.2d at 1224. Here, Dotts personally observed the marijuana growing operation in Adams' house and he was not used as an anonymous informant. Consequently, corroboration of Dotts' information was not necessary. See Rinehart, 864 P.2d at 1224.

In sum, we conclude that Detective Hurtig's misstatements and omissions were immaterial to the determination of Dotts' credibility. Furthermore, we conclude that Dotts' admissions against interest regarding his participation in setting up the marijuana growing operation, without any further corroboration, provided the District Court with a substantial basis for concluding that probable cause supported the search

warrant.

Accordingly, we hold that the District Court properly denied Adams' motion to suppress.

Finally, Adams argues that the search warrant was unconstitutionally overbroad because it did not state with sufficient particularity the items to be seized in Adams' residence. At the conclusion of the February 5, 1996 suppression hearing, Adams informed the District Court that he would file a supplemental brief raising the issue that the search warrant was overbroad. Adams acknowledges that he failed to file this supplemental brief "for reasons contained outside of the court record." Upon review of the record, we also note that no record of Adams' objection concerning the search warrant's overbreadth was made. However, the District Court did address this issue in its February 22, 1996 decision. Conclusion of Law No. 4 states in pertinent part:

[Adams] raised a question about the scope of the search permitted by the Search Warrant. Specifically, [Adams] objects that Detective Hurtig was authorized to search the vehicles as well as the residence itself. . . ..

In this case, however, because no search of the vehicles was apparently conducted, or if one was, no incriminating evidence was located in the vehicles, there is no basis to object to the search.

Now on appeal, Adams raises this issue concerning the search warrant's overbreadth, but he does not argue that authorization for a search of the vehicles was overbroad, rather he argues that the search warrant application and the search warrant were standardized forms enumerating "all the various things that any person, including those engaged in ordinary legal activities, might legitimately have in their homes or offices." Therefore, Adams contends that because the search warrant did not specify with sufficient particularity the items to be seized in Adams' residence, it was unconstitutionally broad. Additionally, Adams asserts that despite his failure to file his supplemental brief, the District Court did consider and rule upon the overbreadth issue in its Memorandum in Support of the Order filed jointly with its February 22, 1996 decision.

The State responds that we should not address this issue because Adams raises it for the first time on appeal. Referring to the District Court's Conclusion of Law No. 4, the State contends that while it appears that Adams objected to the breadth of the search warrant, he only did so to the extent the search warrant authorized the search of the vehicles. The State asserts that Adams never objected to the search warrant on the grounds that the warrant did not state with sufficient particularity the items to be seized within the residence. Consequently, the State argues that Adams raises a new theory for

his objection concerning the search warrant's overbreadth for the first time on appeal, and, therefore, we should not address this issue.  We agree.

A party may not change his theory on appeal from that advanced in the district court.  State v. Henderson (1994), 265 Mont. 454, 458, 877 P.2d 1013, 1016.  Upon review of Adams' brief in support of his motion to suppress evidence and the transcript of the District Court hearing held February 5, 1996, we conclude that Adams did not raise this theory to support his objection to the breadth of the search warrant.  Consequently, we will not address the merits of this argument.

In sum, we hold that the District Court had a substantial basis for concluding that probable cause supported the search warrant, and, therefore, the District Court properly denied Adams' motion to suppress.

Affirmed.


/S/   JAMES C. NELSON


We Concur:

/S/  J. A.  TURNAGE
/S/  KARLA M. GRAY
/S/  TERRY N. TRIEWEILER
/S/  W. WILLIAM LEAPHART